Vahid ARYAN

v.

Cecil MACKEY, President of Texas Tech
University, Robert Ewalt, Vice President
of Student Affairs, and Moses Turner,
Director of Student Life for Texas Tech
University.

Civ. A. No. CA–5–78–125.

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 19, 1978.

Marvin Rogers of West Texas Legal Services, Lubbock, Tex., for plaintiff.

Marilyn Phelan, Gen. Counsel, Texas Tech University, Lubbock, Tex., Lonnie F. Zwiener, Asst. Atty. Gen., Austin, Tex., for defendants.

## ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

The Union of Iranian Students, a campus-recognized organization at Texas Tech University, applied to the school for a permit to hold a peaceful demonstration against the Shah of Iran on the Tech campus. The University granted the permit, with the proviso that during the march, the students could not wear masks. Because the Shah's son, the Prince, is residing in Lubbock, and because anti-Shah demonstrations in other cities have not all been peaceful, the University fears an outbreak of violence. It argues that anonymity may encourage the demonstrators to engage in violent activity which, if they were readily identifiable, they might not otherwise undertake.

Vahid Aryan, a member of Tech's Iranian Student Association and designated by the president of the campus' Union of Iranian Students to represent that organization, filed suit in this court to obtain a temporary restraining order. Claiming the University's restriction violates his First Amendment rights, Aryan wants to march wearing a mask in the demonstration scheduled to occur Friday, October 20, 1978. The University argues that the students' use of masks falls squarely within the prohibitions of the Ku Klux Klan Act because the students intend to deprive the Prince of his constitutional rights. It also contends that anonymity is not a right which the First Amendment protects. In the alternative, the University submits that even if the wearing of masks enjoys some protection under the First Amendment, under these circumstances the state's interests in averting the dangers the masks pose outweighs the students' protected interest in wearing them. For the following reasons, the court rejects the University's arguments and finds that the University regulation impermissibly burdens the plaintiff's First Amendment rights.

### The Ku Klux Klan Act

The University's argument that the demonstrators' activities violate 42 U.S.C. § 1985(3)[1] may be quickly dispatched. Aryan testified that the purpose of the demonstration is to protest against the regime of the Shah of Iran, a regime they believe to be oppressive. The fact that the Prince is in Lubbock undoubtedly heightens the students' motivation to demonstrate. There is no evidence other than pure conjecture, however, that the marchers are "go(ing) in disguise . . . for the purpose" of depriving the Prince of his constitutional rights.

1. If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either indirectly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C. § 1985(3).

## The First Amendment

An analysis of the students' First Amendment rights must necessarily address the two distinct functions which the masks serve. The first is noncommunicative: the students claim that without the masks, they would be afraid to demonstrate because they fear reprisals from the Shah. The second is communicative: the masks have become symbols of protests against the Shah's regime.

## The Noncommunicative Element

 The University's contention that the First Amendment does not grant the right to anonymity is correct. The First Amendment grants the right to hold and express views and beliefs. Serious First Amendment questions arise, however, when there is such a nexus between anonymity and speech that a bar on the first is tantamount to a prohibition on the second.[2] The Supreme Court so held in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) in which it declared unconstitutional a state statute which required foreign corporations, including the NAACP, to disclose their membership lists. The Court wrote:

> On past occasions [the] revelation of the identity of [the NAACP's] rank-and-file members has exposed these members to economic reprisal[s], loss of employment, threat[s] of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that [the] compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and through the consequences of this exposure. *Id.* at 462–463, 78 S.Ct. at 1172.

 It is indisputable that the state may impose reasonable restrictions on the time, place, and manner in which views are presented. *See Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1938). When, as in this case, the activity restricted is so closely connected to the speech that a loss of the activity results in a loss of the expression itself, however, the government must make a strong showing of the restriction's reasonableness. As discussed in greater depth in the following section, the University has a great interest in the prevention of violence on its campus. It has offered only supposition rather than concrete facts that the regulation will further these interests. On this showing, the regulation must fall.

## The Masks as Symbols

 The second purpose the masks serve is communicative. They have become a symbol of opposition to a regime which is of such a character that its detractors believe they must disguise their identity to protect themselves. It is not true that just because a person who engages in conduct intends thereby to express an idea, the conduct is necessarily protected. *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Courts have often held, however, that various symbolic acts are within the scope of the First Amendment. *See, e. g., Tinker v. Des Moines Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The issue to be determined is whether this particular conduct, in light of the government's interest in preventing it, is constitutionally protected.

 In *United States v. O'Brien, supra*, and *Tinker v. Des Moines Community School District, supra*, the Supreme Court set forth the standards which control this

**2.** In *Talley v. California*, 362 U.S. 60, 65, 80 S.Ct. 536, 539, 4 L.Ed.2d 559 (1958): "Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purpose."

case. The Court stated that a regulation is valid, although it imposes incidental limitations on First Amendment freedoms:

—If it furthers an important or substantial governmental interest, 391 U.S. at 376–77, 88 S.Ct. at 1679;

—If the governmental interest is unrelated to the suppression of free expression, *Id.*;

—If there is a sufficient nexus between the restriction and the interest, 393 U.S. at 508–09, 89 S.Ct. 733;

—If the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest, 391 U.S. at 376–77, 88 S.Ct. at 1679.

The burden of proving that the regulation satisfies these criteria is on the University. *Shanley v. Northeast Independent School District,* 462 F.2d 960 (5th Cir. 1972). If it meets all of these four requirements, the University regulation is valid despite any symbolic use of masks in their planned demonstration.

 The first step of this test—that the government interest must be substantial—is clearly satisfied here. It is indisputable that the University has a great interest in preventing violence on its campus.[3] The second step—that the interest be unrelated to the suppression of free expression—is also met. This test inquires into whether the harm the state seeks to avert grows out of the fact of the communication itself; that is, whether the danger arises from the message.[4] In this case, the danger against which the University is trying to guard is that the demonstrators, because of the protection anonymity affords, may become violent. The potential harm, then, is not one resulting from the message the masks convey. Instead, it is a consequence of the masks' noncommunicative aspect. This case is thus different from *Tinker v. Des Moines Independent School District, supra,* and *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), in which the state's goal was to prevent people from reacting disruptively to the content of the speaker's communication. It is instead comparable to *Schneider v. State, supra,* in which the state was unconcerned with the content of a handbill but wanted only to prevent littering. Since the University regulation does not reflect "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *Tinker v. Des Moines Independent School District, supra,* it satisfies the second step of the four-pronged test.

The third standard requires the University to demonstrate a substantial causal relationship between the restriction and the interest the restriction is supposed to further. It is here that the University's argument falters. The University officials are unable to point to any concrete facts which might reasonably have led them to predict the violence they fear. *Tinker v. Des Moines Independent School District,* 393 U.S. at 514, 89 S.Ct. 733. In the language of the Supreme Court there must be:

. . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . *Id.*

They point to violence which has erupted in other cities during anti-Shah demonstrations. They suggest the possibility of nonstudent agitators and terrorists lurking be-

---

**3.** In *Tinker v. Des Moines Ind. School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the court employed "the need for affirming the comprehensive authority of the states and of school officials, consistent with fundamental safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. at 737. The problem in that case, as in this, was that students exercising *their right to* express themselves, collided head-on with the rules of the school authorities. *See, id.*

**4.** If the danger does spring from the message itself, the speech is not automatically protected. Rather, the mode of analysis changes. Instead of applying the balancing test set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1908), the court must switch to a more rigorous standard set forth notably in *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the clear and present danger test. Ely, *Flag Desecration: A Case Study on the Role of Categorization and Balancing in First Amendment Analysis,* 88 Harv.L.Rev. 1482 (1975).

hind the masks. They argue that people hidden by masks lose their inhibitions and may have a greater tendency to become disruptive. Yet they are unable to point to a single concrete fact indicating their suppositions are reasonably likely to become reality. The anti-Shah demonstration in Lubbock during the summer of 1978 was peaceful. Nothing in that march revealed the presence of agitators or terrorists and nothing since that time has forecast their arrival in Lubbock on October 20, 1978. The officials have offered no concrete proof that these students in this demonstration will erupt into the violence that the no-mask regulation is supposed to prevent. Because the connection between the prohibition and the University interest is merely speculative, the regulation cannot stand; for "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. at 737.

For the foregoing reasons, the application for a temporary restraining order is GRANTED. The University, and all its agents and representatives are enjoined from denying plaintiff's permit on the basis that masks will be worn.

All parties were informed of this order at 5:05 p. m., October 19, 1978. The University's oral request for a stay is DENIED.