Vincent J. PINETTE, et al., Plaintiffs,

v.

CAPITOL SQUARE REVIEW AND ADVISORY BOARD, et al., Defendants.

No. C2–93–1162.

United States District Court, S.D. Ohio, Eastern Division.

Jan. 4, 1994.

---

Benson A. Wolman, Moots, Cope & Stanton, Columbus, OH, for plaintiffs.

Richard Adams Cordray, Ohio Atty. Gen., Columbus, OH, for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

On December 21, 1993, the Court issued an Opinion and Order adjudicating the claim set

forth in Count One of Plaintiffs' Amended Complaint. This matter is now before the Court for decision after a trial on the merits of the claims set forth in Counts Two, Three and Four of Plaintiffs' Amended Complaint. The Findings of Fact and Conclusions of Law contained in the Court's Opinion and Order of December 21, 1993 are incorporated herein by reference.

### FINDINGS OF FACT

Defendants granted a permit to the plaintiffs to conduct a rally at the Ohio Statehouse on October 23, 1993. On October 26, 1993, defendants submitted a bill to the plaintiffs in the amount of $15,116.76 for expenses and losses incurred by the state as a result of that rally. On October 29, 1993, plaintiffs applied to defendants for a permit to hold a rally at the Statehouse on January 15, 1994 for the dual purpose of protesting the bill they received from the state for the October 23rd rally and expressing their opposition to the designation of the birthday of Martin Luther King, Jr. as a state and national holiday.

On December 28, 1993, defendants denied plaintiffs' application for a rally on January 15, 1994 citing plaintiffs' failure to pay the October 26, 1993 bill, their unwillingness to comply with the bond requirements contained in the permit application and on the further grounds that the plaintiffs have "engaged in a pattern of harassment and intimidation based on the use of fighting words which creates a clear and present danger to public safety."

In Count Two of the Amended Complaint, plaintiffs seek an order requiring defendants to issue a permit for the January 15, 1994 rally. In Count Three, they seek a declaratory judgment invalidating the bill of October 26, 1993 and in Count Four they seek damages for the violation of their constitutional rights.

The October 23, 1993 rally was attended by about twenty-five members of the Klan and about one thousand protesters. Security for this event required extensive planning and coordination by state, county and city law enforcement agencies. A ten foot high chain link fence was erected in order to separate the Klan from the protesters. Walk-through and hand-held magnetometers were used to detect weapons. Approximately one hundred and thirty weapons were taken from spectators. The Statehouse underground parking garage was closed for security purposes. Major thoroughfares around the Statehouse were closed. Special transportation was arranged to take the Klan members to and from the Statehouse. Over four hundred law enforcement officers were present. These measures were successful in preventing injury and property damage. The combined cost of all security measures is estimated to be something in excess of $100,000. The City of Columbus incurred overtime costs for police and fire personnel in the amount of $57,974.37.

The October 26, 1993 bill sent to the plaintiff consists of $1,243.50 in lost revenues from the underground parking garage; $9,179 for protective fencing and $4,694.26 for labor costs described as "planning, setup, teardown, materials and cleanup."

At the time of the October 23, 1993 rally, defendants had no rules or regulations for charging applicants for security costs incurred in connection with an event and there was nothing in the permit application which would alert an applicant to the possibility that such a charge would be levied after the event.

Ohio Administrative Code § 128–4–03, which became effective on October 29, 1993, provides in part as follows:

(D) In order to protect the condition of the capitol buildings or grounds and ensure the safety of all persons, the board may require a cash bond of one thousand dollars or more to be provided by the permit holder if the event involves the use of equipment, structures, vehicles, banners or signs to be placed on or attached to the capitol buildings or grounds. In lieu of a bond, the permit holder may elect to obtain a letter of credit equal to the amount of the required bond. The bond or letter of credit shall indemnify the state of ohio [sic], against danger, or destruction to, or theft of state property arising in connection with or as a result of the activity of

the organization, participants or spectators. Such bond or letter of credit will be refundable after the use if the organization has complied with all the terms and conditions of the permit.

Defendant has no other rules or regulations or established practice to determine whether a bond should be required for an event or the amount of such bond. It is not clear whether defendants applied Administrative Rule 128–4–03(D) to plaintiffs' application for the January 15, 1994 rally. That application was filed on the very day the rule became effective. There is no evidence that the board determined that a bond would be required for that event or what the amount of any such bond should be.

When plaintiffs made application for the October 23, 1993 rally, they struck out the paragraph of the application form pertaining to bonds and inserted the words "you can't put a price on free speech." Defendants waived the bond requirement for that permit. When plaintiffs completed the application for the January 15, 1994 rally, they crossed out the paragraph number next to the paragraph pertaining to bond requirements and wrote in the words "no price on free speech." Plaintiffs paid the $20 application fee. In the past, the defendants' practice with respect to bond requirements has been to either waive the bond requirement entirely or to require a bond between $50 and $200 based on the judgment of the permit clerk. Plaintiffs were never notified that a bond was required for the January 15, 1994 rally.

The Klan members who participated in the October 23, 1993 rally conducted themselves in a peaceful and orderly manner. They were searched prior to the event and no weapons were found. The Klan protesters were unruly and threatening in their demeanor and actions. The security measures planned for the event were in response to the anticipated violent reaction of the Klan protesters. There was no expectation that the Klan itself would engage in violence. The expenses which were billed to the plaintiffs on October 26, 1993 were not necessitated by the plaintiffs' anticipated or actual actions but were necessitated instead by the anticipated and actual actions of the Klan protesters.

At the October 26, 1993 rally, the Klan members made speeches and played audio tapes. They spoke against affirmative action, integrated schools and interracial marriage. They spoke against Jews, African-Americans and homosexuals and advocated the supremacy of the Caucasian race. They sometimes made a fascist salute and sometimes chanted "White pride" and "White power." They encouraged their adherents to arm themselves and to use all means necessary to accomplish their goals. The Klan protesters chanted "Go home Klan" and "Death, Death, Death to the Klan" and attempted to push through the protective fencing.

The Mayor of the City of Columbus and the Governor of the State of Ohio have publicly expressed their opposition to the granting of a permit for the January 15, 1994 rally. The Mayor testified about his concern for the cost of police protection and its impact on the city's already limited budget for public safety services. The Mayor and Captain Reel of the Ohio State Highway Patrol are concerned about the increased potential for violence at a rally to be held on Martin Luther King, Jr.'s birthday. However, the state has not shown that it is unable to provide adequate security for the kind of rally plaintiffs plan to hold on January 15, 1994.

### CONCLUSIONS OF LAW

In its letter of December 28, 1993 denying plaintiffs' application for the January 15, 1994 rally, the defendants have cited the Administrative Appeal provisions of Chapter 119 of the Ohio Revised Code and Rule 128–4–04 of the Ohio Administrative Code. By delaying action on plaintiffs' permit until December 28, 1993, defendants have foreclosed any possibility of a timely administrative appeal from the denial of the permit. In opposing plaintiffs' request for injunctive relief, defendants have not raised any issues relating to exhaustion, finality or abstention and they have waived any such defenses or objections.

The Ohio Statehouse grounds are the archetypal public forum. They have been used

from time immemorial for all manner of public gatherings and demonstrations by groups of all kinds, including political parties, charitable and religious groups, labor unions, civil rights groups, and the proponents and opponents of all manner of social and political issues.

■ In *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the Supreme Court held that the First Amendment was not violated by a city ordinance which assessed a fee for conducting a parade on the city streets. The Court ruled that such a permit fee may take into consideration the expense of maintaining public order and that it may vary in proportion to the requirements of the event. *Id.* at 576–77, 61 S.Ct. at 766. *See also Stonewall Union v. City of Columbus*, 931 F.2d 1130 (6th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). However, a permit scheme may not delegate overly broad discretion to a government official, the fee may not be based on the content of the message, and any restrictions on speech or expression must be narrowly tailored to serve a significant governmental interest and must leave open ample alternatives for communication. *Forsyth County v. Nationalist Movement*, — U.S. —, —, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992). Defendants' scheme for requiring and setting the amount of bonds for permits vests the Capitol Square Review and Advisory Board with unbridled discretion and is facially unconstitutional. *Id.* Defendants may not properly deny plaintiffs' application for the January 15, 1994 rally for its refusal to comply with an unconstitutional bond requirement.

■ A permit scheme which imposes on the speaker costs which are associated with the listeners reaction to the speech is not content neutral. "Speech cannot be financially burdened any more than it can be punished or banned, simply because it might offend a hostile mob." *Forsyth County*, — U.S. at —, 112 S.Ct. at 2404 (citing *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)) (footnote omitted). "A State may not impose a charge for the enjoyment of a right

guaranteed by the Federal Constitution." *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1522 (1985). Defendants' attempt to charge plaintiffs for the costs of security measures necessitated by the anticipated reaction to their speech is a violation of their First Amendment rights and the state's bill of October 26, 1993 is void and unenforceable. It follows that defendants' denial of a permit for the January 15, 1994 rally on the grounds that plaintiffs have failed to pay the October 26, 1993 bill is likewise unconstitutional.

■ The First Amendment generally prevents the government from prohibiting speech because it disapproves of the ideas expressed. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Simon and Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). However, constitutional jurisprudence has always recognized certain limited exceptions to this rule. The Constitution does not protect obscenity, defamation or fighting words. Fighting words are a direct personal insult or invitation to exchange fisticuffs. *Texas v. Johnson, supra*, 491 U.S. at 409, 109 S.Ct. at 2542. They are not a means of exchanging views, rallying supporters or registering a protest, but are words directed against individuals to provoke violence or to inflict injury. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

■ The fighting words exception has always been narrowly construed. *R.A.V. v. St. Paul*, — U.S. —, —, 112 S.Ct. 2538, 2567, 120 L.Ed.2d 305 (1992). "The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." *Id.* at —, 112 S.Ct. at 2559. Plaintiffs' message and their methods of expression are deeply offensive to many, however, they are not fighting words in the constitutional sense. As Justice White noted in his concurring opinion in *R.A.V. v. St. Paul*, even "[b]urning a cross at a political rally would almost certainly be protected expression. *Cf. Brandenburg v.*

796

*Ohio,* 395 U.S. 444, 445, 89 S.Ct. 1827, 1828, 23 L.Ed.2d 430 (1969)." *R.A.V. v. St. Paul,* —— U.S. at —— n. 4, 112 S.Ct. at 2553 n. 4.

Defendants have failed to show that plaintiffs have engaged in or that they are likely to engage in speech or expression which falls within the narrow definition of fighting words. The evidence does not support defendants' assertion that plaintiffs have engaged in a pattern of harassment and intimidation based on the use of fighting words and this groundless assertion is not a proper ground for defendants' denial of plaintiffs' application for a permit to hold a rally on January 15, 1994.

 In some circumstances the threat of violence may provide a sufficiently compelling state interest to justify restrictions on speech. *See Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,* 972 F.2d 365 (D.C.Cir.1992). Here, defendants have not sought to impose any restrictions on the time, place or manner of plaintiffs' speech but have instead denied their permit application entirely leaving open no alternatives for communication of the two messages they wish to express.

Plaintiffs seek an award of damages in the amount of $1,000 "for their expenditures and added time and attention necessary to secure their rights." Plaintiffs have produced no evidence of actual damages. The Capitol Square Review and Advisory Board is an arm of the State of Ohio and would be immune to liability for damages under the Eleventh Amendment. The plaintiffs have failed to show that defendants Keller, Shellenbarger and Finan who have been sued in their individual, as well as their official capacities, had any personal responsibility for the actions of which plaintiffs complain. Thus plaintiffs have failed to prove that they are liable for damages in their individual capacities. Defendants are entitled to judgment in their favor on plaintiffs' claim for monetary damages.

### CONCLUSION

Thirty years ago the Reverend Dr. Martin Luther King, Jr. confronted hostile and unruly crowds in many southern cities. If the state had been free to impose the cost of security measures on him and his followers the Civil Rights movement of the 60's might have died in its infancy. In order to insure freedom of speech, we must tolerate the free expression of ideas with which we disagree. And our response to that speech, no matter how pernicious, ought to reflect the beliefs of Dr. Martin King:

> I am convinced that if we succumb to the temptation to use violence in our struggle for freedom, unborn generations will be the recipients of a long and desolate night of bitterness, and our chief legacy to them will be a neverending reign of chaos.

Defendants are ordered to grant a permit to the plaintiffs for a rally at the Statehouse on January 15, 1994. The Court hereby declares that the state's October 26, 1993 bill to the plaintiffs for expenses and losses incurred in connection with plaintiffs' October 23, 1993 rally is void and unenforceable. Plaintiffs' claim for money damages is dismissed with prejudice. The costs of this action are assessed against the defendants.

It is so ORDERED.