**AMERICAN KNIGHTS OF THE KU KLUX KLAN, Plaintiff,**

v.

**CITY OF GOSHEN, INDIANA, Defendant.**

**No. 3:98CV403RM.**

United States District Court, N.D. Indiana, South Bend Division.

May 4, 1999.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, for American Knights of the Ku Klux Klan, plaintiff.

Larry A. Barkes, Hartzog, Barker, Hepler and Saunders, Goshen, IN, Michael F. DeBoni, Yoder, Ainlay, Ulmer and Buckingham, Goshen, IN, for City of Goshen, defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

The City of Goshen enacted an ordinance that would, among other things, make it illegal for members of the American Knights of the Ku Klux Klan to wear masks in public assembly. The United States Constitution protects a group's speakers the right to anonymity when past harassment makes it likely that disclosing the members would impact the group's ability to pursue its collective efforts at advocacy. The Goshen ordinance violates that constitutional guarantee.

### I. BACKGROUND

On June 16, 1998, the Common Counsel of the City of Goshen, Indiana enacted Ordinance 3829:

A. It shall be unlawful for any person 18 year of age or older to wear a mask, hood or other device in any public place for the purpose of disguising or concealing his or her identity.

B. This ordinance does not prohibit any person from wearing a mask, hood or other device in any public place for religious, safety, or medical reasons.

C. For the purpose of this ordinance, a "public place" shall mean any lane, walk, alley, street, road, public way or highway within the City of Goshen or upon any property owned by a governmental entity in the city.

D. Any person violating the provisions of this ordinance shall be subject to a fine of up to Two thousand five hundred dollars ($2,500.00).

E. This ordinance may be enforced by a member of the Police Department....

Goshen Mayor Allan Kauffman explained in his deposition that the ordinance was passed in response to Ku Klux Klan activity in Goshen and a number of letters he received from residents requesting a "no mask" ordinance. He also stated that Goshen believed that the Klan's appearance in the city had caused intimidation and fear because citizens did not know the masked people's identity, and that such reactions are reduced when "we know who our adversaries are and we can have discussion with them," *i.e.*, that the ordinance might "enhance civil discourse."

The American Knights of the Ku Klux Klan, the plaintiff in this case, challenges the ordinance as unconstitutional. The American Knights of the Ku Klux Klan was founded about five years ago by its "National Imperial Wizard," Rev. Jeffery Berry of Butler, Indiana, an ordained minister in the Universal Life Church. Although the American Knights of the Ku Klux Klan shares its belief in racial separation with the group historically known as the Ku Klux Klan, the American Knights of the Ku Klux Klan claims no association whatsoever with any other current group using the Ku Klux Klan name. Accordingly, the court refers to the plaintiff as AKKKK in this memorandum.

AKKKK considers itself a religion. According to Rev. Berry, AKKKK has seven sacred symbols: the robe, the hood (including the mask), the Bible, the cross, fire, water, and the sword. The hood and attached mask, Rev. Berry explains, carry special significance during religious ceremonies because members use them to hide themselves before God because they are sinners in His eyes.

AKKKK appeared in Goshen, with some members masked, to disseminate their ideas several times before the June, 1998 anti-mask ordinance, but has learned from the Goshen police that the ordinance will be enforced against its members if they appear in public wearing their masks. In addition to the religious basis asserted for the hood and mask, AKKKK claims that its members wear their full uniform publicly, including the sacred symbol of the hood (and attached mask), because it is an essential part of their uniform and organizational identity. AKKKK also asserts that many of its members wear their masks because they want to remain anonymous and so reduce the likelihood that they will be harassed, threatened, or attacked, will lose their employment, or suffer other types of retaliation for the admittedly unpopular ideas the group advocates.

II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) "mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden of proof at trial." "Where the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Although the moving party must initially identify the basis for its contention that no genuine issue of material fact exists, the nonmoving party cannot rest on his pleadings, but must produce his own evidence. Rule 56(e) requires that the nonmoving party who bears the burden of proof on an issue allege specific facts showing that there is a genuine issue for trial by his own affidavits or by

the depositions, answers to interrogatories, and admissions on file....

In considering whether there are any genuine issues of material fact, we view the record and extract all reasonable inferences from the evidence in the light most favorable to the nonmoving party. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Where a fact is disputed, the nonmoving party must show that the disputed fact is material under the applicable law. The applicable law will dictate which facts are material. Only disputes that could affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264–265 (7th Cir.1996) (citations omitted). The parties agree that no genuine issues of fact exist, and that the court should decide the constitutionality of Goshen's anti-mask ordinance on the basis of the summary judgment record. The court is not so convinced of the absence of genuine issues of fact in the summary judgment record, but existing genuine issues do not preclude summary judgment because they are not material to the bases on which the court finds summary judgment appropriate.

### III. DISCUSSION

AKKKK presents several challenges to the constitutionality of the anti-mask ordinance. It believes the ordinance is unconstitutionally vague on its face because it inadequately describes the activities it proscribes and gives law enforcement officers unbridled discretion in its enforcement. AKKKK argues that the ordinance is overbroad as well because it reaches so wide a variety of the expressive speech and behavior of parties not before the court— adult masqueraders, environmental protesters wearing gas masks, and street theater actors. As applied to their prayer and other religious activities in public, AKKKK claims the ordinance violates its members' rights to freely exercise their religion. AKKKK also claims that wearing their full uniform (including their masks) is an essential part of their identity and ability to convey their message, and that the ordinance unconstitutionally restricts this symbolic speech. Finally, AKKKK claims that the ordinance violates its members' rights to express themselves and associate anonymously. This final point provides the central basis for the court's ruling.

AKKKK argues that, in wearing their masks, its members exercise their rights to anonymous speech and association. It openly acknowledges the disdain with which their message is usually received— that their group is "extremely unpopular." According to Rev. Berry, AKKKK does not make public the names of its members, and members wear their masks to protect their anonymity. Berry Aff., ¶¶ 12, 18. Concealing their identity, he explains, is very important because of the harassment, threats of violence, violence, job firings, and other retaliation that has been caused by membership in AKKKK. *Id.* ¶ 11. Rev. Berry also says AKKKK considers anonymity important to attracting and keeping members; he reports that he "know[s] from talking to [his] members that if members are not allowed to appear in public without being able to preserve their anonymity with their hoods and masks that they will not participate in public activities because they are fearful of having their identity known." *Id.* ¶ 20.[1]

As examples of the harassment its members have experienced and continue to fear, AKKKK offers incidents involving a member and a former member whose identities became known. The present member, a Goshen resident, attributes the

---

1. Because of the reprisals its members have suffered, AKKKK argues that their members' mask-wearing for the purpose of preserving anonymity should fall under the ordinance's safety exception ("This ordinance does not prohibit any person from wearing a mask, hood or other device in any public place for religious, safety, or medical reasons.").

following to the disclosure of her membership: a bomb threat, vandalism against her house, death threats, and an incident in which she found a Barbie doll head floating in ajar of gasoline on her porch. The former member, also a Goshen resident, was yelled at and threatened with physical harm after his membership was revealed.

Goshen agrees that at least some AKKKK members wear their masks to conceal their identity and retain their anonymity. Pointing to evidence that some AKKKK members appear in public without masks, Goshen argues that the ordinance requires them to do only what many members already do. Goshen asserts that crime prevention is a legitimate and substantial interest, and that the anti-mask ordinance bears a substantial relationship to crime prevention because it aids in the apprehension of criminals and discourages the commission of crimes. Goshen characterizes AKKKK fears as unsubstantiated because it has not shown that the vandalism (specifically, paint balls shot at the present member's house) relates to membership, and asserts that these fears do not outweigh the government's substantial interest. Goshen believes that even if AKKKK members decide not to appear in public without masks, the anti-mask ordinance has a negligible effect on AKKKK members' ability to disseminate their views because the ordinance doesn't prohibit them from appearing in public or from using other available means of communication.

That some AKKKK members already appear in public without masks does not diminish the force of AKKKK's case. One person's choice to reveal his or her identity does not delimit another person's First Amendment rights. Faced with the task of deciding whether the ordinance violates AKKKK members' First Amendment rights to express themselves and associate anonymously, the court agrees with AKKKK that, on the record presented, it violates that right, and does so unconstitutionally.

■ The First Amendment embraces the right to communicate and associate anonymously. *See Buckley v. American Constitutional Law Foundation, Inc.,* —— U.S. ——, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *National Association for the Advancement of Colored People v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In *NAACP v. Alabama,* the Court blocked Alabama's attempt to require the NAACP to reveal its members' names and addresses because it "entail[ed] the likelihood of a substantial restraint upon the exercise by [the NAACP's] members of their right to freedom of association." *Id.* at 462, 78 S.Ct. 1163. In *Buckley v. Valeo,* the Court upheld the disclosure requirements of the Federal Election Campaign Act (requiring political parties and individual candidates to disclose certain contributors and contributions). The court explained:

> We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *NAACP v. Alabama* we have required that the subordinating interest of the State must survive exacting scrutiny. We also have insisted that there be a "relevant correlation" or "substantial relation" between the governmental interest and the information required to be disclosed.

424 U.S. at 64, 96 S.Ct. 612 (footnotes and citations omitted). While recognizing the importance of group association to effective advocacy of beliefs and ideas, the Court found that the disclosure requirements directly served the government's interests (aiding voters in evaluating those who seek public office, deterring corruption and avoiding the appearance of corruption, and facilitating data-gathering) and "appear[ed] to be the least restrictive

means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 66–68, 96 S.Ct. 612.

The principles discussed in *NAACP v. Alabama* and *Buckley v. Valeo* apply to identity disclosure requirements affecting the First Amendment free association and expression rights of people trying to disseminate ideas to the public. In *Talley v. California,* the Court held void on its face a Los Angeles ordinance requiring any handbill to contain the names of the persons who wrote it and distributed it. 362 U.S. at 64–65, 80 S.Ct. 536. The ordinance, the Court found, might deter perfectly peaceful discussions of matters of importance; "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." *Id.* Noting that "one who is rightfully on a street . . . carries with him there as elsewhere the constitutional right to express his views in an orderly fashion . . . by handbills and literature as well as by the spoken word," the Court rejected the city's attempt to justify the ordinance as aiding in "identify[ing] those responsible for fraud, false advertising and libel." *Id.* at 63–64, 80 S.Ct. 536 (quoting *Jamison v. State of Texas,* 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943)). Likewise, in *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court struck down an ordinance prohibiting the anonymous distribution of political leaflets. "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342, 115 S.Ct. 1511. Finding the category of speech—"advocacy of a politically controversial viewpoint"—to be "the essence of

First Amendment expression," the court applied "exacting scrutiny" and struck the ordinance as not being narrowly tailored to serve an overriding state interest. *Id.* at 347, 115 S.Ct. 1511.

Most recently, in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), the Court struck down a Colorado law requiring initiative petition circulators[2] to wear identification badges bearing their names. Three petition circulators testified that the badge law kept potential circulators from circulating petitions in public; one also testified about harassment he experienced as a circulator of a hemp initiative petition. *Id.* at 645. The Court applied "exacting scrutiny" in weighing the injury to speech[3] against the State's proffered interest of "enabl[ing] the public to identify, and the State to apprehend, petition circulators who engage in misconduct." *Id.* at 645–646. The court concluded that the badge requirement "discourage[d] participation in the petition circulation process by forcing name identification without sufficient cause." *Id.* at 646.

■ On the record before the court, there can be no doubt that the ordinance, by prohibiting the wearing of masks for the purpose of concealing identity in public, burdens the free speech and association rights of AKKKK members. *See Aryan v. Mackey,* 462 F.Supp. 90, 92 (N.D.Tex.1978) (finding that "[s]erious First Amendment question arise, however, when there is such a nexus between anonymity and speech that a bar on the first is tantamount to a prohibition on the second" in anti-mask case); *Ghafari v. Municipal Court for the City and County of San Francisco,* 87 Cal.App.3d 255, 260, 150 Cal.Rptr. 813 (1978) (striking law flatly

---

2. In Colorado, citizens may make laws directly through initiatives placed on election ballots. *See Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. at ——, 119 S.Ct. at 639.

3. The Court found the injury to speech to be heightened "because the badge requirement

compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest," *i.e.,* "at the same time they deliver their political message." 525 U.S. at ——–——, 119 S.Ct. at 645–646 (contrasting the badge requirement to a reporting requirement).

prohibiting anonymous public appearances as "inhibit[ing] the exercise of free speech or exposes the speaker who dares, to retaliation...."); cf. *State v. Miller*, 260 Ga. 669, 398 S.E.2d 547, 553 (1990) (finding the record "devoid of any proof of any injury to or loss of a job by members of the Klan"). This determination must be made without regard to the worthiness of the ideas AKKKK espouses; if anything, the unpopularity of their ideas enhances the argument for protecting anonymity. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. at 345 n. 8, 115 S.Ct. 1511. AKKKK presents cogent evidence of the link between its members' masks and its members' speech: retaliation that its members suffered as a result of disclosure of their identity,[4] as well as Rev. Berry's testimony about the importance of anonymity to the group's ability to attract and keep members and to members' willingness to participate in public activities. Goshen's summary judgment submission corroborates the repercussions of appearing in public: "Law enforcement assistance was required to keep opposing subjects back as the Klan was preparing to leave" after the July 20, 1996 AKKKK appearance, *See* Defendant's Statement of Material Facts at 11–12 and Ex. G thereto, and a riot nearly occurred "as opposing groups followed the members of the Klan home" after the May 27, 1998 AKKKK appearance. *Id.* From this record, the court concludes, as did the Supreme Court in *Talley v. California,* that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." 362 U.S. at 64, 80 S.Ct. 536.

■ Obvious differences exist between Goshen's anti-mask ordinance and leafleting and name disclosure laws the Supreme Court has addressed. For one, the anti-mask ordinance forces identity disclosure in a non-written manner, reliant on facial rather than name recognition. Goshen also points out that the ordinance doesn't require disclosure of the members' names, addresses, or any other personal information. But those are distinctions without differences: the evidence reveals rallies and demonstrations within the members' own community, where facial recognition might be expected to disclose name, address and other commonly known information. The court must apply the same "exacting scrutiny" analysis that was applied in the cases discussed above. As in those cases, the speech at issue in this case—speech on the public streets touching on issues of public concern—lies at the core of the First Amendment. *See Frisby v. Schultz,* 487 U.S. 474, 479–480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (discussing quintessential public fora—public streets and parks—which, "by long tradition or by government fiat have been devoted to assembly and debate").[5]

4. Goshen calls one member's claims of retaliation "unsubstantiated," offering evidence that some of the activities she ascribes to retaliation (paint balling incidents) occurred all around the city. Even if the paint ball incident had nothing to do with the member's AKKKK activities, the remaining accounts of retaliation provide ample basis to support the court's conclusion. And, although none of the cases of retaliation on which AKKKK relies involved disclosure of the members' identities as a result of appearing unmasked at a public rally or leafleting session (one member was followed home after a rally, and the other was publicly listed as a speaker at the city council meeting at which the ordinance was addressed), the court finds no meaningful basis to distinguish these means of disclosure from members' inability to conceal his or her face in public.

5. Goshen does not argue otherwise, or that the American Knights' speech is, like obscenity, defamation, fighting words, threats of violence, or advocacy of imminent lawless action, unprotected or less protected because its content is "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

And, like those cases, above, the restriction at issue in this case is not content neutral. By prohibiting anonymity, it is a direct regulation of the content of speech or expression. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. at 345, 348, 115 S.Ct. 1511.[6]

■ Under this standard of "exacting scrutiny," the court may only uphold Goshen's anti-mask ordinance if it is narrowly tailored to serve an overriding or compelling state interest. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. at 347, 115 S.Ct. 1511. The undisputed facts in this case lead to the conclusion that the ordinance is not so tailored. While preventing violence and identifying and apprehending criminals are compelling governmental interests, *see Pinette v. Capitol Square Review and Advisory Bd.*, 874 F.Supp. 791, 796 (S.D.Ohio 1994) (citing *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365 (D.C.Cir.1992)), the record does not support a connection between the ordinance and Goshen's asserted interests and the ordinance is not narrowly tailored to achieve the Goshen's stated goals.

By making anonymity virtually impossible, the anti-mask ordinance significantly inhibits AKKKK members' expression. By requiring unmasked faces, it specifically links the members to their unpopular ideas, unlike a more general disclosure requirement. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. at 355, 115 S.Ct. 1511. Although the disclosure exists only as long as the person appears in public, as opposed to the more permanent publication of a list or printing of a name on a leaflet, it occurs at the very moment the American Knights deliver their message, when the reaction to that message is most intense. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. at ——, 119 S.Ct. at 645. And for at least some members, the ordinance effectively prohibits participation in public events.

Not all disclosure requirements are unconstitutional, *see, e.g. Buckley v. Valeo*, 424 U.S. at 60–84, 96 S.Ct. 612 (upholding disclosure requirements of Federal Election Campaign Act of 1971); the court still must consider the requirement in light of the governmental interest asserted. In this case, on the record presented, the burden that this ordinance places on free speech and association rights far outweighs Goshen's interests. As an initial matter, the evidence reveals no connection between Goshen's interest in preventing violence and the anti-mask ordinance. Goshen agrees that there must be a substantial relation between the government's interest and the information that must be disclosed, and argues that the ordinance will prevent violence, crime, and disorder. In support, Goshen offers evidence in the form of descriptions of six AKKKK appearances in Goshen between July 20, 1996 and June 27, 1998, some of which required police to maintain control and order. *See* Defendant's Statement of Material Facts at 11–12 and Ex. G thereto. Goshen also

---

**6.** The restriction also is content-based to the extent that Goshen's interests turn on the audience's reaction to speech as a rationale for the anti-mask ordinance. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Boos v. Barry*, 485 U.S. 312, 320, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Crawford v. Lungren*, 96 F.3d 380, 384–385 (9th Cir. 1996); *Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia*, 972 F.2d 365, 373–374 (D.C.Cir.1992) ("Violence is a form of listener reaction...."); *Sons of Confederate Veterans, Inc. v. Glendening*, 954 F.Supp. 1099, 1104 (D.Md.1997); *United States v. McDermott*, 822 F.Supp. 582, 590 (N.D.Iowa 1993). *But see State v. Berrill*, 196 W.Va. 578, 474 S.E.2d 508 (1996) (finding any limitation on speech imposed by anti-mask law merely a secondary effect). A content-based restriction is subject to strict scrutiny, under which it must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). For these reasons, the court does not address Goshen's arguments under *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which establishes a more lenient analysis applicable to content-neutral restrictions.

relies upon testimony of Dr. Patrick J. Furlong, a history professor from Indiana University South Bend, that "various factions of the Ku Klux Klan have utilized robes and masks to conceal their identities, with the intent to frighten and intimidate others."[7] Lastly, Goshen points out that it may rely on the experiences of other cities and evidence of violence at Ku Klux Klan demonstrations in other locales, but it offers no evidence from other cities regarding mask-wearing, such as its impact on violence or arrest rates.

Goshen's evidence amply demonstrates the potential for disorder, and even violence, when a group delivers messages that others find insulting and intolerable in a public forum. Goshen's evidence does not, however, provide any sound connection between that potential and the disclosure at issue. Accepting Goshen's characterizations of past AKKKK appearances,[8] Goshen does not explain or offer any evidence to support a connection between the masks and the violence. At four of the six appearances, some of the AKKKK members were masked and some were not; Goshen supplies no information regarding the use of masks at the remaining two appearances, including the one that involved a "near-riot." Goshen's descriptions of past appearances are too vague for the court even to determine whether it is the AKKKK members or those (presumably unmasked) protesting against them who engaged in the "jostling" and "near-rioting."

Neither Dr. Furlong's testimony that Ku Klux Klan-related groups have used masks for the purpose of scaring and intimidating nor Goshen's references to the experiences of other cities provides any persuasive link. The court cannot conclude from Dr. Furlong's general observations about the activities of KKK-related groups over the decades that Goshen faces an increased threat of disorder and violence when demonstrators such as AKKKK wear masks.[9] And in referencing other cities' experiences, Goshen does not identify any other city, and does not describe their experiences. Cf. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (reliance on findings by Seattle and other cities on secondary effects of adult movie theaters). No evidence in the record would allow a finding that restricting masks would serve the interests Goshen asserts. Cf. Grider v. Abramson, 994 F.Supp. 840, 845 (W.D.Ky. 1998) (finding officials' decision to physically separate KKK and opposition rallies, which kept rallies within view and hearing of each other, lessened threat of violence while "encourag[ing] the very robust debate the First Amendment is designed to protect and encourage"); Aryan v. Mackey, 462 F.Supp. 90, 92–93 (N.D.Tex.1978); State v. Miller, 260 Ga. 669, 398 S.E.2d 547, 553 (1990) (discussing period of harassment, intimidation, and violence carried out by mask-wearing Klansmen that preceded anti-mask statute's passage in 1951).

Even if the court could find that the anti-mask ordinance would help to prevent violence, the court could not find that this ordinance is narrowly-tailored to reach that end. Goshen argues that the effect on speech is merely incidental and that by

---

7. The American Knights objects to Dr. Furlong's qualifications to render his opinions, but its motion is moot because the court's conclusion is the same whether or not his opinions are considered.

8. These descriptions are vague. Other than general references to "jostling," police having to keep the American Knights and their opponents "under control," and a "near-riot" when "opposing groups followed the members of the Klan home" after they passed out literature at the Goshen High School, they contain no concrete or specific description of any violent or criminal behavior. The evidence is likewise vague about the number of officers needed at these appearances, describing their presence as "large," rather than indicating their number.

9. Although the absence of such evidence forms part of the reasoning in favor of the court's decision in this case, the court has not decided (because it need not decide) whether such a showing would suffice to uphold an anti-mask ordinance such as Goshen's.

prohibiting only masks and not the rest of their attire, the ordinance does not prohibit AKKKK from communicating their message in public. As already explained, however, the ordinance's effect on speech is more than merely incidental. The ordinance prohibits anonymity and/or has the effect of directly chilling speech, which amount to serious and far-reaching limitations on free speech and association. The ordinance simply burdens more speech than is necessary to serve Goshen's purpose of preventing violence. First Amendment cases are replete with time, place, and manner restrictions that effectively serve their goals without changing the content of or chilling the speakers' messages. *See, e.g. Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia,* 972 F.2d 365, 373–374 (D.C.Cir. 1992) (finding restriction of KKK march to four-block area not justified in circumstances); *Grider v. Abramson,* 994 F.Supp. 840, 845 (W.D.Ky.1998) (finding physical separation of KKK and opposition justified).

Goshen implies a second justification for its anti-mask ordinance: to aid law enforcement officials in apprehending criminals. Masks obviously hinder identification, but the summary judgment record does not support any connection between the anti-mask ordinance and Goshen's purported need to see faces to identify and apprehend criminals. Goshen's materials do not suggest that AKKKK members engaged in criminal activity while masked. *See* Defendant's Statement of Material Facts at 11–12 and Ex. G thereto (describing necessity of law enforcement "to keep opposing subjects back" and when "opposing groups followed the members of the Klan home"). Criminals sometimes wear masks for the express purpose of concealing their identities, but when constitutional rights to free speech and association are at issue and there is no indication of criminal conduct by masked persons, it cannot be presumed that all, or even most, mask-wearers do so for criminal purposes.

For the reasons explained above, summary judgment is warranted for the plaintiff and against the defendant. "Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. at 357, 115 S.Ct. 1511. The right to anonymity is abused when used for the purpose of violence and criminality, but "our society accords greater weight to the value of free speech than to the dangers of its misuse." *Id.* Goshen remains free to enforce laws punishing disorderly and criminal behavior directly, but Goshen has not justified the anti-mask ordinance as a means of doing so indirectly. *See id.; Ghafari v. Municipal Court for the City and County of San Francisco,* 87 Cal.App.3d 255, 261, 150 Cal. Rptr. 813 (1978).

AKKKK also challenges Goshen's anti-mask ordinance on grounds of overbreadth, vagueness, and as abridging their right to engage in symbolic speech and free exercise of religion, but the court need not reach those arguments. It is enough to hold—and the court holds nothing more than this—that on the basis of this summary judgment record, this ordinance unconstitutionally infringes on the First Amendment rights of this group of people. This court reaches this holding without evaluating the message AKKKK seeks to share with the public in Goshen; any such evaluation would itself be inconsistent with the First Amendment. "The result [the Court has] reached is dictated by the fundamental proposition that if these civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises." *Invisible Empire of the Knights of the Ku Klux Klan, Maryland By and Through Kelly v. Mayor of Thurmont, Md.,* 700 F.Supp. 281, 290–291 (D.Md.1988) (quoting *Collin v. Smith,* 578 F.2d 1197, 1210 (7th Cir.1978)); *see also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d

333 (1988) ("[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.").

### IV. CONCLUSION

There is an undeniable irony in today's holding. More than a century ago, the Ku Klux Klan wore masks to terrorize persons they wanted to drive from their communities. Today, the Klan's descendant organization uses its masks to conceal the identities of those who hold ideas the community wishes to drive off. Still, a ·generation after the Ku Klux Klan's final heyday in Indiana, brave and unmasked men, women and children faced violence and thuggery in hostile southern streets, where Klansmen once rode, to establish the principle that the Constitution applies to all of us. The court holds no more than that today.

For the reasons set forth above, the court GRANTS American Knights of the Ku Klux Klan's summary judgment motion (filed March 5, 1999), DENIES the City of Goshen's summary judgment motion (filed March 5, 1999), and DENIES AS MOOT the American Knights of the Ku Klux Klan's motion to strike [docket entry 38].

SO ORDERED.