Peter SCHUMANN, Jules Rabin, Margo Sherman, Robert Ernsthal, Helen Rabin, Helen Hunter, Pearl Oyle, Andrew Trompetter, individually and as Members of the Bread and Puppet Theater, an Unincorporated Association, Plaintiffs,

v.

The STATE OF NEW YORK and Howard R. Leary, as Police Commissioner of the City of New York, Defendants.

No. 67 Civ. 1861.

United States District Court
S. D. New York.

June 13, 1967.

Alexander Kolben, Arthur Handler, Jeremiah S. Gutman, and Burt Newborne, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of State of New York, by Joel Lewittes, Asst. Atty. Gen., and J. Lee Rankin, Corporation Counsel of City of New York, by Milton Stein, New York City, for defendants.

## OPINION

TYLER, District Judge.

Plaintiffs are members of the Bread and Puppet Theater, a New York City pantomime troupe which offers, at least occasionally, dramatic presentations concerning current social and political issues. As performers, they have taken part in public demonstrations in New York City opposing United States military involvement in Vietnam. They customarily appear at these demonstrations in costumes and masks which are designed to heighten the protest of the day.[1]

On December 27, 1966, plaintiffs were engaged in a demonstration in front of St. Patrick's Cathedral in New York City. Their specific purpose that day was to express their disagreement with a speech made earlier in the month by Cardinal Spellman.[2] During the course of this performance, a police officer "threatened" them with arrest under Section 710 of the New York Penal Law, McKinney's Consol.Laws, c. 40. That section provides:

> "An assemblage in public houses or other places of three or more persons disguised by having their faces painted, discolored, colored or concealed, is unlawful, and every individual so disguised, present thereat, is guilty of a misdemeanor; but nothing contained in this section shall be construed as prohibiting any peaceful assemblage for a masquerade or fancy dress ball or entertainment, or any assemblage therefor of persons masked, or as prohibiting the wearing of masks, fancy dresses, or other disguise by persons on their way to or returning from such ball or other entertainment; if, when such masquerade, fancy dress ball or entertainment is held in any of the cities of this state, permission is first obtained from the police authorities in such cities respectively for the holding or giving thereof, under such regulations as may be prescribed by such police authorities." N.Y. Penal Law § 710 (McKinney 1944).

Upon being so warned, plaintiffs discontinued their demonstration.

---

1. One of their performances protesting the war in Vietnam has been described as follows. "This was the scene: Giant puppet heads of Vietnamese women chained together, their stark white faces bound by black blindfolds. A mock wooden airplane, with shark's teeth, diving out of the March sky. A band of skullheads, blowing an unearthly tune on horns improvised from washing machine agitators and rattling a dirge on old gasoline cans filled with the nuts and bolts of a mechanized society." Reade, "The Demonic Protest of the Bread and Puppet Theater", Renewal Magazine, April-May 1967, p. 3.

2. On this occasion, one of the performers was masked as Mary and carried a sign reading "I am Mary. My child was napalm-bombed in Vietnam."

The following day, December 28, 1966, Mr. Henry M. diSuvero, one of staff counsel for the New York Civil Liberties Union, sent a telegram to Police Commissioner Howard Leary and Deputy Police Commissioner Franklin Thomas of New York City. The telegram stated that another, similar demonstration would be staged in front of St. Patrick's Cathedral on ` December 30, 1966. Apparently on plaintiffs' behalf, diSuvero also requested immediate assurance that "the flimsy pretexts used to harass and threaten arrest will cease."

On December 30, 1966 diSuvero arrived at St. Patrick's Cathedral in advance of plaintiffs. He introduced himself as the attorney for the Bread and Puppet Theater to a police officer at the scene, Captain Francis McCormick. Mr. diSuvero told Captain McCormick that plaintiffs would insist on wearing masks; Captain McCormick replied that plaintiffs would be arrested if they did so. "Intimidated" by the officer's remarks, plaintiffs conducted their demonstration without masks.[3]

In the five months since December 30, plaintiffs have not attempted to perform with masks nor have they applied for a permit as provided by Section 710. With the coming of warmer weather, however, they wish to revive their demonstrations and have brought this action alleging that the threatened enforcement of Section 710 violates their constitutional rights under the First, Fifth, Ninth and Fourteenth Amendments to the Constitution. They seek a temporary injunction pending the determination of their claims and the designation of a three-judge court under 28 U.S.C. §§ 2281 and 2284 to hear this application.

There are two essential requirements for convening a three-judge court to enjoin enforcement of a state statute. Not only must the constitutional question raised be a substantial one, but the complaint must also set forth a basis or bases for invoking the traditional equity jurisdiction of the federal courts. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). In this connection, a single judge may consider whether plaintiffs have demonstrated any irreparable damage to themselves or any likelihood thereof. Linehan v. Waterfront Commission of New · York Harbor, 116 F.Supp. 401, 405 (D.C., S.D.N.Y.1953). It may also consider whether plaintiffs have an adequate, untried remedy under state law. See Douglas v. City of Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Davis v. State of Maryland, 248 F.Supp. 951 (D.Md.1965).

As is the practice in many of the burgeoning applications to convene a three-judge court and enjoin the enforcement of a state statute, plaintiffs place heavy reliance upon Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). They characterize Dombrowski as creating a broad exception to the traditional reluctance of federal courts to interfere with state criminal proceedings whenever and however First Amendment rights are brought into play.

To be sure, Dombrowski expanded the scope of federal injunctive relief against threatened state criminal proceedings. But the decision in Dombrowski turned on markedly different circumstances than those faced by the Bread and Puppet Theater. Plaintiffs in that case, a civil rights organization and its members, had actually been indicted under certain Louisiana statutes ostensibly designed to control. subversive activities. Buttressed by affidavits and written offer of proof, their complaint spelled out a scheme by defendants to harass plaintiffs and discourage them from asserting and vindicating the constitutional rights of Negro citizens of Louisiana. In addition, their complaint and supporting papers spelled out a substantial loss of

---

3. For the purposes of this memorandum, plaintiffs' allegations of fact in their complaint and affidavits have been accepted as true and complete.

freedom of expression if they were obliged to await disposition by the Louisiana courts.

■ Bread and Puppet Theater has not and cannot claim a similar plight. To begin with, it is unrealistic to infer from the two incidents of more than five months ago a wholesale, bad faith pattern of harassment and intimidation by New York City's police which would justify injunctive relief. Second, Section 710 does not, on its face, restrict free speech or beliefs. In actuality, Section 710 by its very terms protects the activity of these plaintiffs. Specifically, the statute provides that three or more persons may obtain a permit to wear masks at, among other functions, an "entertainment" production. It does not demean the seriousness of the Bread and Puppet Theater's efforts to make the obvious observation that these masquerade protests are entertainment, and none the less so because of any social or political themes or overtones.

■ Plaintiffs' difficulty is self-imposed; they have never actually applied for a permit.[4] The power of the state, particularly under such circumstances as are presented by the record here, to require a permit for public gatherings by persons wearing masks cannot be seriously questioned. Indeed, plaintiffs do not attempt to do so. As they apparently recognize, the police, particularly in urban areas, are entitled to know, for obvious reasons of crime prevention, the identity of persons assembling on the streets in masks. Moreover, as plaintiffs plainly hope, their performances with masks will attract a crowd. Control of crowds is a legitimate police function, and the licensing feature of the statute is a necessary first step to reasonable control.

■ In fact, plaintiffs have effectively conceded that they would not be unreasonably burdened by compliance with the permit requirements of Section 710. During the course of the argument of this motion, their counsel suggested that the requested injunction order might provide that the police be given advance notice of the time and place of plaintiffs' proposed performance, the number of persons participating and suitable identification of such persons. This is substantially the kind of information to be reasonably sought by the authorities through the statutory permit procedures. See Administrative Code of City of New York §§ 435–9.0 and B32–307.0.

■ Plaintiffs' secondary argument that the statute suffers the unconstitutional vice of failing to provide definite standards for issuance of permits is not supported by the complaint and moving affidavits. To bespeak the obvious, such an argument, if it ever can be supported, must await an attempt by plaintiffs to obtain a permit.

Plaintiffs' counsel suggested at oral argument that Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), constitutes a precedent for the issuance of an injunction by a federal court in that, like plaintiffs here, Kunz had not applied for or obtained a permit. But this suggestion rests upon a misapprehension of the facts in *Kunz*. In that case involving a New York City ordinance requiring a permit to conduct public worship meetings on the street, Kunz was arrested in 1948 for conducting such a meeting without a permit. Previously, however, he had applied for permits, only to have his applications rejected.[5] On appeal from his conviction, the Supreme Court held the ordinance to be unconstitutional.

■ Finally, it should be observed that plaintiffs have an adequate remedy under state law. An action for a declaratory judgment has been recognized in New York as a remedy available to test the constitutionality of a criminal

---

4. Contrary to plaintiffs' belated suggestion, the diSuvero telegram cannot be considered seriously as a permit application.

5. And, in one instance, Kunz obtained a permit, only to have it revoked thereafter.

statute under which prosecution is threatened. New York Civil Practice Law and Rules § 3001. DeVeau v. Braisted, 5 A.D.2d 603, 174 N.Y.S.2d 596 (2d Dept.1958), affd. 5 N.Y.2d 236, 183 N.Y.S.2d 793, 157 N.E.2d 165 (1959), affd. 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed. 2d 1109 (1960). There are no allegations here that New York State courts or officials will fail to respect rights guaranteed by the United States Constitution or that state court procedures are in any way inadequate. All that appears is that plaintiffs either are unaware of the state remedy, or, for reasons not explained, prefer to litigate in a federal court.

The applications for a temporary injunction and for convention of a three-judge court are denied, and the complaint is dismissed. It is so ordered.