OPINION OF THE COURT
Gregory Carro, J.
Each defendant here is charged in an information with violating Penal Law § 240.35 (4) which prohibits being masked or disguised in a public place while congregating with others who are also masked or disguised. Each defendant except Dennis Burke is also charged with unlawful assembly. In addition, Daniel S. Chard and Christopher Teret are charged with resisting arrest, Darren Kramer is charged with possession of burglar’s tools and possession of a graffiti instrument, and *175 Dennis Burke is charged with possession of a graffiti instrument.
In a collective omnibus motion, each defendant moves to dismiss the information on the ground that, on its face and as applied to them, Penal Law § 240.35 (4) violates their rights under the United States Constitution. They argue specifically that, on its face and as applied to them, the statute (1) impedes their right to free association guaranteed by the First Amendment, and (2) is vague and overbroad. They argue further that the unlawful assembly and resisting arrest, which depend on Penal Law § 240.35 (4), must also fail. Darren Kramer contends that the burglar’s tools and graffiti instrument which were seized after his arrest for violating the unconstitutional statute must be suppressed.[1]
The defendants, who describe themselves as anarchists, were arrested while participating in a May Day demonstration in Union Square Park on May 1, 2000. As relevant here, it is alleged in sum and substance in each information that each was wearing a bandana covering his face except for the eyes and forehead with others also wearing bandanas. In some informations it is also alleged that the defendants, and in other informations it is alleged that the crowd, shouted slogans like “take back the streets,” and “police state.”
Discussion
First Amendment
Section 240.35 (4) of the Penal Law provides that a person is guilty of loitering when
“[b]eing masked or in any manner disguised by unusual or unnatural attire or facial alteration, loiters, remains or congregates in a public place with other persons so masked or disguised * * * except that such conduct is not unlawful when it occurs in connection with a masquerade party or like entertainment if, when such entertainment is held in a city which has promulgated regulations in connection with such affairs, permission is first obtained from the police or other appropriate authorities.”
It is clear that on its face New York’s antimask law regulates conduct, not speech. Freedom of speech guaranteed by the First *176 Amendment to the United States Constitution includes conduct which is symbolic expression, as well as written or spoken words (see, Tinker v Des Moines Ind. Community School Dist., 393 US 503 [1969] ).[2] However, the defendants here do not argue that the bandanas which they wore on May 1, 2000 constituted communicative conduct or symbolic speech. Rather, in the first part of their challenge they contend that the antimask law chills their right to freedom of association, which is distinct but related to the right to freedom of speech. It is their position that their masks concealed their faces and afforded them anonymity which is essential to the exercise of the right to freedom of association for the advancement of their unpopular beliefs and ideas.
The defendants have the heavy burden of establishing this claim beyond a reasonable doubt (McKinney’s Cons Laws of NY, Book 1, Statutes § 150; People v Pagnotta, 25 NY2d 333, 337 [1969]). A statute is cloaked with a presumption of constitutionality that favors legislative enactments (People v Demperio, 86 NY2d 549 [1995]).
The United States Supreme Court recognized the importance of anonymity to freedom of association in National Assn. for Advancement of Colored People v Alabama (357 US 449 [1958] [hereinafter NAACP]). In NAACP the Court reviewed a judgment holding the NAACP in contempt for refusing to disclose to the Attorney General a list of its rank-and-file members. The Attorney General demanded the list pursuant to a statute that required a foreign corporation to qualify before doing business in the State. According to the State of Alabama, the list was necessary to determine whether the NAACP was conducting intrastate business in Alabama in violation of the statute.
The NAACP resisted disclosure on the ground that “the effect of compelled disclosure of the membership lists will be to abridge the rights of its rank-and-file members to engage in lawful association in support of their common beliefs.” (NAACP, supra, at 460.) On the record before the Court was an “uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.” (Id., at 462.)
*177 Based on the evidence in the record, the Court concluded that compelled disclosure was likely to adversely affect the members’ ability “to pursue their collective effort to foster beliefs which they admittedly have the right to advocate.” (NAACP, supra, at 463.) After examining the State’s interest in obtaining disclosure and finding it insufficient, the Court reversed the contempt judgment.
In Brown v Socialist Workers ‘74 Campaign Comm. (459 US 87 [1982]), the Socialist Workers Party challenged the constitutionality of the disclosure provisions of the Ohio Campaign Expense Reporting Law that required every candidate for political office to file a statement identifying each contributor and each recipient of a disbursement of campaign funds. After a trial, the District Court for the Northern District of Ohio entered a temporary restraining order barring enforcement of the provision.
On the record before the District Court was proof of specific incidents of private and government hostility towards the Socialist Workers Party and its members during the four years preceding the trial, including threatening phone calls, hate mail, burning of literature, destruction of property, police harassment and the firing of shots at the Party office. Some members of the Party were fired from their jobs. In addition, the Party presented evidence of massive FBI surveillance and counterintelligence operations against the Party, including attempts to impair its functioning by disseminating negative information, sending anonymous letters to members, supporters and employers. The FBI shared its reports with other Government agencies.
Applying a relaxed standard of proof for “minor political parties” enunciated in Buckley v Valeo (424 US 1 [1976]), the District Court concluded that this overwhelming evidence of governmental and private hostility towards the Socialist Workers Party and its members established a “reasonable probability” that disclosing the names of contributors and recipients will subject them to threats, harassment and reprisals. The Supreme Court agreed that the First Amendment prohibited Ohio from compelling disclosures by the Socialist Workers Party that will subject members who are identified to the reasonable probability of threats, harassment and reprisals. It affirmed the District Court’s judgment.
As NAACP and Brown (supra) illustrate, the key to a successful First Amendment challenge to a disclosure requirement is undisputed evidence that establishes, as a matter of law, the *178 requisite nexus between compelled disclosure of the identities of individuals and resulting recriminations from either Government officials or private parties (Federal Election Commn. v Hall-Tyner Election Campaign Comm., 678 F2d 416 [2d Cir 1982]).
Although the defendants here rely on the holdings in NAACP and Brown (supra), they have offered no evidence of a pattern of harassment against them such as compelled the Court in NAACP and Brown to bar disclosure. They have asked this court to follow those cases based solely on a description of anarchism as a political philosophy and a list of famous anarchists of the past which they have set forth in their supporting memorandum. This is insufficient under any reasonable reading of NAACP and Brown, even for a pretrial motion.
Although this court is aware that throughout history political dissidents often paid a heavy price for their unpopular beliefs, this general knowledge is not a substitute for the type of evidentiary showing that plaintiffs offered in NAACP and Brown (supra). Accordingly, this court has no basis to conclude, as the defendants urge, that if they are forced to uncover their faces they will be subjected to harassment that will abridge their First Amendment rights to associate for the promotion of their beliefs and ideas. For this reason, this portion of their challenge cannot succeed.
In light of this result, the court need not address other issues raised by the defendants’ claim such as whether they are members of a “minor political party” within the meaning of Brown (supra), or a membership organization within the meaning of NAACP (supra), whether revealing one’s physical identity is analogous to disclosing the names of the members of an organization or the contributors to or recipients of a political party’s campaign contributions, and the quality of the State’s interest in enforcing its antimask law.
Facial Vagueness
The defendants next claim that the statute is unconstitutionally vague on its face because it allows city officials unbridled discretion to decide whether an event is a “masquerade party or like entertainment” and, therefore, lawful. They argue that the law contains no definitions to prevent administrators from denying permits based on the message of the activity.
The court notes at the outset that even though the defendants have not applied for a permit under Penal Law § 240.35 (4), they may nevertheless assert this claim. When a licensing stat *179 ute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for a permit (City of Lakewood v Plain Dealer Publ. Co., 486 US 750, 755-756 [1988]; MacDonald v Safir, 206 F3d 183 [2d Cir 2000]). For purposes of this analysis, the court assumes, based on Aryan v Mackey (462 F Supp 90 [ND Tex 1978]), that under certain circumstances masks can have expressive content. In Aryan the court held that the masks worn by demonstrators were a symbol of protest against the Shah of Iran.
The exemption contained in the antimask statute provides that a “masquerade party” or “like entertainment” is not subject to the prohibition if it is held in a city that has applicable regulations and has obtained a permit. The defendants do not attack the validity of New York City’s permit schemes (Administrative Code of City of NY § 10-110, and the “Activity Rules” of the Street Activity Permit Office of the Community Affairs Unit of the Office of the Mayor).
“ ‘[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license’ must contain ‘narrow, objective, and definite standards to guide the licensing authority’ ” (Forsyth County v Nationalist Movement, 505 US 123, 131 [1992]). “A government regulation that allows arbitrary application is ‘inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.’ ” (Id., at 130, quoting Heffron v International Socy. for Krishna Consciousness, 452 US 640, 649 [1981].) When a regulation is attacked as arbitrary, the issue before the court is whether “there is anything in the ordinance” preventing the administrator from exercising his discretion in a content-based manner (Forsyth County v Nationalist Movement, at 133, n 10).
In this case, it is true, as the defendants complain, that the statute does not define “masquerade party” or “like entertainment.” However, the applicable test is whether the provision is so vague that “men of common intelligence must necessarily guess at its meaning.” (Connally v General Constr. Co., 269 US 385, 391 [1926].) Where legislation gives no indication that a different meaning is intended, the plain meaning of statutory words controls (People v Cruz, 48 NY2d 419 [1979]).
In its earlier forms the antimask law exempted “any peaceful assemblage for a masquerade or fancy dress ball or *180 entertainment, or any assemblage therefor of persons masked” (Penal Code of 1881 § 452; Penal Law of 1909 § 710). Section 240.35 (4) of the current Penal Law eliminated the antiquated terms “fancy dress ball or entertainment,” and substituted “like entertainment.” It also retained the exemption for a “masquerade party.”
“Masquerade” is defined as a social gathering of persons wearing masks and often fanciful costumes (see, Merriam Webster’s Collegiate Dictionary 714 [10th ed 1994]). “Entertainment” is defined as a public performance (see, Merriam Webster’s Collegiate Dictionary 386 [10th ed 1994]). Reading these words in their ordinary sense and in historical context, “like entertainment” refers to social gatherings, dances and performances that involve masks or costumes.
Although at their outermost boundaries the words “masquerade party” and “entertainment,” like any words, may be susceptible of meanings different from their plain meanings, these specific categories prevent an administrator from exercising unbridled discretion. Moreover, these categories of exempt activities are not drawn along content-related lines. Indeed, “like entertainment” encompasses such entertainment as the Bread and Puppet Theatre, a pantomime troupe that performed dramatic presentations in costumes and masks protesting the war in Vietnam (see, Schumann v State of New York, 270 F Supp 730 [SD NY 1967], construing Penal Law of 1909 § 710 [now Penal Law § 240.35 (4)]).
The guidance provided to administrators by these definite categories of exempt activities stand in marked contrast to the ordinance in Shuttlesworth v City of Birmingham (394 US 147, 149-150 [1969]), which allowed the City Commission to refuse a parade permit if Commission members believe “the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.” As the United States Supreme Court observed in Broadrick v Oklahoma (413 US 601, 608 [1973]),
“Words inevitably contain germs of uncertainty and * * * there may be disputes over the[ir] meaning [s] * * * [However,] There are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand *181 and. comply with.”
Accordingly, the portion of the statute that exempts a masquerade party and like entertainment is not unconstitutionally vague.
Facial Overbreadth
The defendants also challenge the statute on the ground that it is impermissibly overbroad because it prohibits masks which have expressive content, such as a gas mask worn to protest environmental degradation, as well as masks which provide anonymity as a corollary to the right to freedom of association. In this case, the defendants have not contended that they wore their masks as symbolic expressions. Nor have they established that they were a necessary corollary to their right to freedom of association. Therefore, before considering the merits of their claim, the court must determine if the defendants have standing to challenge the constitutionality of the statute as it applies to others who engage in conduct that is entitled to First Amendment protection.
Where a litigant claims that a statute is overbroad in violation of the First Amendment, he can under certain circumstances attack it even though his own conduct is not protected. “Litigants * * * are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.” (Broadrick v Oklahoma, supra, at 612.)
Recognizing that the “facial overbreadth doctrine” is “strong medicine,” the Supreme Court has placed limitations on it. One such limitation is invoked where the statute regulates conduct rather than speech. “Although such laws, if too broadly .worded, may deter protected speech to some unknown extent, there comes a point where the effect — at best a prediction— cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe” (Broadrick v Oklahoma, supra, at 615). Accordingly, where conduct and not merely speech is involved, a facial overbreadth challenge will not lie unless the overbreadth is “real [and] substantial,” and the statute is incapable of a reasonable limiting construction (id).
Under this standard, in People v Hollman (68 NY2d 202 [1986]), the Court of Appeals declined to entertain a facial *182 overbreadth challenge to a penal statute. Hollman was convicted under Penal Law § 245.01 for sunbathing nude at Riis Park. That statute provides that “A person is guilty of exposure if he appears in a public place in such a manner that the private or intimate parts of his body are unclothed or exposed.” The statute exempts breast feeding and any person entertaining or performing in a play, exhibition, show or entertainment.
After rejecting the defendant’s claim that his nudity was expressive conduct, the Court considered his standing to challenge the constitutionality of the statute on its face. The defendant urged the Court to invalidate the statute because it forbade protected activities such as nude modeling for an art class or classroom demonstrations involving human genitalia.
The Court first explained the “facial overbreadth doctrine,” noting its far-reaching implications and cautioning that a statute should not be invalidated because of a remote possibility that, under an unusual set of facts, it might reach protected conduct (People v Hollman, supra, at 209). It warned against invalidating a statute on its face and prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. While recognizing that Penal Law § 245.01 could reach constitutionally protected nudity, the Court of Appeals refused to consider the facial overbreadth challenge on that basis because such applications would represent “only a tiny fraction of the conduct within the statute’s reach.” (Id.)
The Hollman Court’s analysis of Penal Law § 245.01 is equally pertinent here. It cannot be disputed that prohibiting the gathering of masked people in public is a proper exercise of the State’s police power to prevent and detect crime (see, Schumann v State of New York, 270 F Supp 730, supra; Ghafari v Municipal Ct., 87 Cal App 3d 255, 150 Cal Rptr 813; State v Miller, 260 Ga 669, 398 SE2d 547 [1990]). In addition, an anti-mask law furthers the State’s legitimate interest in protecting its citizens from intimidation, violence and actual and implied threats (see, for example, State v Miller, supra). These State interests are implicated even when masks are worn for anonymity or as symbolic expression, since any mask conceals the face of the wearer.
The effect of the statute on protected activity is not “real and substantial.” It reaches only the wearing of masks or other facial disguises in a public place while congregating with others who are masked or whose faces are disguised. All other *183 forms of political or other expression are permissible, including wearing of costumes in public places, and wearing masks in nonpublic places. Although it is possible that the law could be impermissibly applied to the wearing of masks for symbolic expression in nonexempt activities, these offensive applications are not so numerous as to produce a chilling effect on protected activity. The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to support an overbreadth challenge (Members of City Council v Taxpayers for Vincent, 466 US 789, 800 [1984]).
Moreover, the statute is capable of a reasonable limiting construction. New York’s first antimask law, “An Act to prevent persons appearing disguised and armed,” was enacted in 1845 as sections 1 and 6 of chapter 3 of the Laws of 1845. Section 1 provided in pertinent part that “Every person who, having his face painted, discolored, covered or concealed, or being otherwise disguised, in a manner calculated to prevent him from being identified, shall appear in any road or public highway, or in any field, lot, wood or enclosure, may be pursued and arrested in the manner hereinafter provided.” Section 6 provided that “Every assemblage in public houses, or other places, of three or more persons disguised as aforesaid, is hereby declared to be unlawful.”
The purpose of the “Act” was to quell the “anti-rent riots,” an armed insurrection by farmers in the Hudson Valley. “This particular statute was addressed to a specific group of insurrectionists who, while disguised as ‘Indians’, murdered law enforcement officers attempting to serve writs upon the farmers. The ‘Indians’ were in fact farmers, who as part of their costumes, wore women’s calico dresses to further conceal their identities.” (People v Archibald, 58 Misc 2d 862, 864 [App Term, 1st Dept 1968] [dissenting opn].)
Section 1 of chapter 3 of the Laws of 1845 was replaced in 1881 by section 887 (7) of the Code of Criminal Procedure. Section 887 (7) provided that a person who, having his face painted, discolored, covered or concealed, or being otherwise disguised, in a manner calculated to prevent his being identified, appears in a road or public highway, or in a field, lot, wood or inclosure is a vagrant. Section 6 of chapter 3 of the Laws of 1845 was replaced in the Penal Code of 1881 by section 452, which was part of title XIII dealing with crimes against the public peace. Section 452 provided that “An assemblage in public houses or other places of three or more persons disguised by having their faces painted, discolored, *184 colored or concealed, is unlawful, and every individual so disguised, present thereat, is guilty of a misdemeanor.” It also created an exemption, found in Penal Law § 240.35 (4), for “any peaceful assemblage for a masquerade or fancy dress ball or entertainment.” (Penal Code of 1881 § 452.)
Section 452 was reenacted in its entirety in section 710 of the Penal Code of 1909 which was replaced in 1965 by the current Penal Law § 240.35 (4). Section 887 of the Code of Criminal Procedure was repealed in 1967 (L 1967, ch 681, § 90).[3] Accordingly, the conclusion is inescapable that section 240.35 (4) has its origins in the 1845 “Act to prevent persons appearing disguised and armed.”
As its history indicates, the antimask law was enacted originally to prohibit wearing masks in order to prevent identification during lawless activity. Construing section 240.35 (4) so as to prohibit the wearing of masks “for no legitimate purpose” is consistent with this purpose. In addition, this construction excludes from the statute’s prohibition masks worn for communicative purposes and for anonymity as a necessary corollary to freedom of association, both protected by the First Amendment (see, People v Shack, 86 NY2d 529, 535 [1995], which held that Penal Law § 240.30 [2] did not run afoul of the First Amendment because by its terms it removes from its application “legitimate communication”).
This construction, which may reasonably be found implicit in the words used by Legislature, satisfies the court’s obligation to save the enactment from any constitutional infirmity (see, People v Dietze, 75 NY2d 47, 52 [1989]; see also, People v Finkelstein, 9 NY2d 342 [1961]). As so construed, the statute would not reach most constitutionally protected uses of masks. Any impermissible applications of the statute so construed can be remedied on an “as applied” or case-by-case basis (People v Hollman, 68 NY2d 202, supra).
Accordingly, the defendants’ challenge to the statute on the ground that it is facially overbroad fails.
*185 “As Applied” Claims
Finally, the defendants contend that the statute is unconstitutional as applied to them. They argue (1) that their arrests constitute an unconstitutional prior restraint of expression, (2) that the statute amounts to viewpoint discrimination, and (3) that the statute is not content-neutral.
Each of these claims is based on the premise that the bandanas the defendants were wearing are entitled to protection under the First Amendment. Since they have heretofore argued, unsuccessfully, only that their bandanas were a necessary corollary to their First Amendment right to freedom of association, they have not established for purposes of these “as applied” arguments that their bandanas were protected political expression. Accordingly, these “as applied” challenges must fail.
In conclusion, the defendants’ motion to dismiss the information is denied in all respects. The motions to suppress the tangible property recovered from defendants Kramer and Burke are also denied.

. The court assumes that Dennis Burke also moves to suppress the graffiti instrument on the same theory, although defense counsel did not mention his motion in his supporting affirmation.

. The First Amendment to the United States Constitution provides that “Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.” The First Amendment is applicable to the States by the Due Process Clause of the Fourteenth Amendment.

. In People v Archibald (supra), the Appellate Term, First Department, affirmed the defendant’s conviction under section 877 (7) for wearing a white evening dress, high heel shoes, blonde wig, female undergarments and facial makeup on a subway station platform at 4:00 a.m. The court rejected his claim that the statute required a specific intention of employing the disguise to commit some illegal act. The Court of Appeals affirmed (People v Archibald, 27 NY2d 504 [1970]).